2020R00110/jlh

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Susan D. Wigenton |
| v. | : | Crim. No. 20-134 (SDW) |
| ZACHARY OHEBSHALOM | : | 18 U.S.C. § 371 |

**INFORMATION**

The defendant having waived in open court prosecution by indictment, the United States Attorney for the District of New Jersey charges:

**Relevant Entities and Definitions**

1. Unless otherwise indicated, at all times relevant to this Information:

    a. Defendant Zachary Ohebshalom ("Ohebshalom") worked on behalf of a pharmacy located in Fair Lawn, Bergen County, New Jersey (the "Fair Lawn Pharmacy"). He was a resident of Fort Lee, New Jersey.

    b. Joseph Vangelas, a/k/a "Joseph Miller," a conspirator not named as a defendant in this Information, had a close personal relationship with Ohebshalom and directed the business operations of and maintained a financial interest in the Fair Lawn Pharmacy. He was a resident of Fort Lee, New Jersey.

    c. Marlene Vangelas, a conspirator not named as a defendant in this Information, was the sole nominal owner of the Fair Lawn Pharmacy and directed the day-to-day operations of the Fair Lawn Pharmacy. She was a resident of River Vale, New Jersey.

   d. Mark A. Filippone, M.D. ("Dr. Filippone"), a conspirator not named as a defendant in this Information, was a medical doctor who maintained a medical practice at offices located in Jersey City, New Jersey (the "Jersey City Premises") and Wallington, New Jersey (the "Wallington Premises"). He was a resident of Wallington, New Jersey.

   e. The Fair Lawn Pharmacy was a retail pharmacy that began dispensing prescription medications in or about January 2016. The Fair Lawn Pharmacy dispensed, among other things, expensive prescription pain creams to Dr. Filippone's patients.

   f. The United States provided certain benefits, including health care benefits and wage loss replacement, to federal employees who sustained a work-related injury. *See* Federal Employees' Compensation Act, 5 U.S.C. § 8101, *et seq*. The federal workers' compensation program was administered by the United States Department of Labor, Office of Workers' Compensation Program ("DOL-OWCP"). If a federal employee was injured on the job, they were required to submit to DOL-OWCP certain forms and medical reports that contained information about the claimant and the injury. Once approved for benefits, individuals could claim health care benefits, including for qualifying doctors' visits and prescription drugs, through DOL-OWCP. As such, the federal workers' compensation program constituted a "health care benefit program" as defined in 18 U.S.C. § 24(b).

g. A "National Drug Code," or as it more colloquially known, an "NDC," was a unique numerical code that is used to identify specific drug products.

h. A "test claim" referred to the process used by pharmacy professionals to determine, among other things, a patient's insurance carrier, coverages, eligibility, and co-pay. A pharmacy employee may submit electronically a "test claim" through pharmacy billing software regarding a specific patient or prescription. The "test claim" elicits a nearly-instantaneous response that shows a patient's insurance information and the reimbursement rate for the particular drug's NDC. The "test claim" is then "reversed," meaning the claim is withdrawn and no money is caused to be paid out by the patient's insurance program.

### The Conspiracy to Violate the Anti-Kickback Statute

2. From in or about May 2016 through in or about May 2019, in Bergen and Hudson Counties, in the District of New Jersey and elsewhere, defendant

**ZACHARY OHEBSHALOM**

knowingly and willfully conspired and agreed with Joseph Vangelas, Marlene Vangelas, Dr. Filippone, and others to knowingly and willfully commit certain offenses against the United States, that is, to knowingly and willfully receive and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in return for the referral of an individual

3

to another person for the furnishing and arranging for the furnishing of any items and services, namely, the referral of medically unnecessary pain cream prescriptions for patients to a pharmacy located in Fairlawn, New Jersey, for which payment was made in whole or in part under a Federal health care program, namely, the federal workers' compensation benefits program administered by the Department of Labor, Office of Workers' Compensation, contrary to Title 42, United States Code, Section 1320a-7b(b)(1)-(2).

## Object of the Conspiracy

3. The object of the conspiracy was for Ohebshalom, Joseph Vangelas, Marlene Vangelas, and others to induce Dr. Filippone to prescribe and continue to prescribe expensive, medically unnecessary pain creams in the exact formulations they desired by paying Dr. Filippone kickbacks including, among other things, purchasing Dr. Filippone's medical office and then permitting Dr. Filippone to continue to use the premises, for which he routinely failed to pay rent.

## Manner and Means of the Conspiracy

4. To carry out the conspiracy and to effect its unlawful object, Ohebshalom, Joseph Vangelas, Marlene Vangelas, and Dr. Filippone engaged in a variety of means and methods including, among others, those described below.

    a. Dr. Filippone treated hundreds of United States Postal Service employees who had purportedly sustained on-the-job injuries.

  b. Dr. Filippone submitted medical reports and other required documentation to DOL-OWCP attesting to his patients' purported disability to qualify them for, among other things, health care benefits under DOL-OWCP even though such patients were not, in fact, disabled.

  c. Joseph Vangelas cultivated a relationship with Dr. Filippone, in part, based upon the patient population that Dr. Filippone serviced.

  d. Joseph Vangelas directed the formation and opening of the Fair Lawn Pharmacy, in large part, to dispense drugs to Dr. Filippone's patients.

  e. To conceal Joseph Vangelas's management and financial interest in the Fair Lawn Pharmacy in light of his close relationship with Dr. Filippone, Marlene Vangelas formed and opened the Fair Lawn Pharmacy in her own name. Nonetheless, Joseph Vangelas continued to direct the business operations of and maintained a financial interest in the Fair Lawn Pharmacy.

  f. To service Dr. Filippone's patients, the Fair Lawn Pharmacy obtained approval to seek reimbursement from DOL-OWCP for prescription drugs it dispensed at the Fair Lawn Pharmacy.

  g. Joseph Vangelas, a non- medical professional, concocted formulas for prescription pain creams.

  h. Joseph Vangelas, Marlene Vangelas, and Ohebshalom directed pharmacists employed by the Fairlawn Pharmacy to submit "test claims" to DOL-OWCP in order to determine the most lucrative NDCs for

ingredients that could be used in prescription pain cream formulations. In other words, the ingredients or drugs contained in the pain creams, including the strength or amount used, were not chosen based on medical need or its therapeutic value, if any, but rather, based on the amount DOL-OWCP would reimburse the Fair Lawn Pharmacy for such prescriptions.

  i. Joseph Vangelas, Marlene Vangelas, and Ohebshalom caused such "test claims" to be submitted to DOL-OWCP without any valid prescription, using patient names without such patients' knowledge or authorization, and for the sole purpose of ascertaining the pain cream formulations with the highest reimbursements.

  j. Joseph Vangelas, Marlene Vangelas, and Ohebshalom directed pharmacists and others employed by the Fairlawn Pharmacy to prepare and print prescription labels containing the most expensive formulations of the prescription pain creams that a physician could use to prescribe the concocted, high-reimbursing pain creams.

  k. Joseph Vangelas and Ohebshalom brought the pre-printed prescription labels to Dr. Filippone and solicited him to prescribe the pain creams to his patients.

  l. To induce Dr. Filippone to write and continue to write such prescriptions for his patients, Joseph Vangelas and Marlene Vangelas purchased Dr. Filippone's Jersey City Premises at a time when Dr. Filippone was suffering significant financial distress, and permitted Dr. Filippone to

continue to use the Jersey City Premises even though Dr. Filippone did not reliably pay rent.

    m.    Dr. Filippone used the pre-printed labels provided to him by Joseph Vangelas and Ohebshalom to write hundreds of prescriptions to many of his patients.

    n.    Dr. Filippone wrote these prescriptions not because they were medically necessary but rather because he needed to continue using the Jersey City Premises, for both professional and personal reasons, and because Joseph Vangelas and Marlene Vangelas, in consultation with Ohebshalom, allowed Dr. Filippone to continue to use the Jersey City Premises even though Dr. Filippone did not reliably pay rent.

## Overt Acts

5.    In furtherance of the conspiracy, and to effect its unlawful object, Ohebshalom, Joseph Vangelas, Marlene Vangelas, and Dr. Filippone committed, and caused to be committed, the following overt acts in the District of New Jersey and elsewhere:

    a. On or about November 20, 2017, during a conversation that included Ohebshalom, Ohebshalom referred to the Jersey City Premises as a point of leverage to force Dr. Filippone to continue to send prescriptions to the Fair Lawn Pharmacy.

    b. On or about November 29, 2017, during a conversation that included Marlene Vangelas and Ohebshalom, Ohebshalom acknowledged that

Dr. Filippone was not paying his rent for the Jersey City Premises, and that a real landlord would not allow a tenant to go five months without paying rent. The conversation also included a discussion that Filippone's non-payment of rent was worth approximately $30,000 at that time.

  c. On or about March 15, 2018, during a conversation between Joseph Vangelas and others, Joseph Vangelas stated, in substance, that whether he sought to collect rent from Dr. Filippone for the Jersey City Premises depended on the volume of prescriptions that Dr. Filippone steered to the Fair Lawn Pharmacy.

  d. On or on or about November 20, 2018, during a conversation that included Dr. Filippone, Dr. Filippone acknowledged that he was not paying rent on the Jersey City Premises and that his daughter lived rent-free in the upstairs apartment of the Jersey City Premises. During the same conversation, Dr. Filippone acknowledged, among other things, that he was providing four to five pain cream prescriptions per day to the Fair Lawn Pharmacy and noted that Joseph Vangelas helped him out by allowing Dr. Filippone to use the Jersey City Premises.

In violation of Title 18, United States Code, Section 371.

_[signature]_
CRAIG CARPENITO
United States Attorney

CASE NUMBER: 20-

**United States District Court
District of New Jersey**

UNITED STATES OF AMERICA

v.

ZACHARY OHEBSHALOM

**INFORMATION FOR**
18 U.S.C. § 371

**CRAIG CARPENITO**
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

**JOSHUA L. HABER**
*ASSISTANT U.S. ATTORNEY*
*(973) 645-3978*

USA-48AD 8
(Ed. 1/97)